LAURENCE E. TIGHE, APPELLANT, V. COMBINED INSURANCE COMPANY OF AMERICA, A CORPORATION, APPELLEE.

628 N.W.2d 670

Filed June 15, 2001.   No. S-00-143.

Daniel A. Martin for appellant.

Jonathan Nash, Jr., and Robert M. Slovek, of Kutak Rock, L.L.P., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellant, Laurence E. Tighe, filed suit for benefits under a disability insurance policy issued by Combined Insurance Company of America (Combined). The district court granted Combined's motion for summary judgment. The court found that the terms of the disability insurance policy issued to Tighe were unambiguous; that Tighe had received income from his employer, Credit Bureau Services, Inc. (CBS), and from self-employment through Associated Business Management (ABM) following his disability; and that Combined had properly reduced the amount of his benefits.

The primary issue in this appeal is what income is considered to be self-employment income under Combined's reduction-of-benefits clause (reduction clause). Combined argues that self-employment income consists of gross receipts, thereby reducing Tighe's benefits to zero. Tighe argues that income from self-employment should be gross receipts minus business expenses. We determine that income from self-employment in Combined's reduction clause means the net income of the insured after subtracting business expenses from gross receipts and that Tighe's benefits should not have been reduced. Accordingly, we reverse.

## BACKGROUND

The relevant portion of the reduction clause in Combined's policy, entitled "Coordination With Other Compensation," states: "The Monthly Indemnity will be reduced by: (A) Income received from any employer, [or] from self-employment . . . ."

Tighe purchased CBS in 1961 and is the sole shareholder of that subchapter S corporation. He remained president of CBS until 1991. Although he was not president after 1991, he remained actively involved in the management of CBS. From approximately 1973 to July 1994, he was paid a management fee from CBS of $3,200 a month. This amount was not paid to Tighe as a salary but was paid directly to ABM, a sole proprietorship that Tighe also owned. The $3,200 a month was reflected as part of ABM's gross receipts.

Tighe's accountant, Jerome C. Bahm, testified by deposition that although CBS was Tighe's employer in 1994, the $3,000 to $4,000 that Tighe received from CBS through ABM was a management consultation fee, which was self-employment income. Tighe's federal income tax returns showed little income in the form of wages: in 1994, his wages were $218; in 1995, his wages were $319; and in 1996, his wages were $445. Bahm also testified that the management consultation fees would usually not show up as self-employment income on Tighe's tax returns because ABM's receipts—which included such fees from CBS—were always offset by various business expenses. ABM has shown a net loss for almost every year since the 1960's. In 1994, Tighe's Schedule C for ABM showed a net profit of $117. In

1995, ABM showed net losses of $9,676. In 1996, the company's net losses were $13,758, and in 1997, the losses were $68,715.

Tighe testified that on average, he worked 30 hours a week at CBS until he had a heart attack in July 1994. After that time, he stated that he was no longer an employee of CBS and that he did not receive a management consultation fee from CBS because he was unable to perform his original duties. He said that he tried working 2 to 3 hours a week in October 1994, but was unable to continue at that time. He reported in a claim letter to Combined that he worked approximately 10 hours a week from February 1995 until February 1997, when his doctor advised him to stop working altogether.

Tighe admitted that he continued to take $3,000 to $4,000 a month from CBS after July 1994, but he stated that this money was not taken as income for services provided. Instead, he said that the money he received from CBS after his heart attack was a draw on his accumulated earnings and profits from CBS. In 1994, 1995, and 1996, however, the money Tighe received from CBS continued to be paid directly to ABM and was reflected as part of that company's gross receipts.

In February 1997, Tighe apparently became aware of his coverage under Combined's policy and filed a claim for disability benefits. In May, Combined issued a check for $9,450 to Tighe to cover his total disability up to February 15, 1995. The record does not indicate how Combined calculated that benefits payment. Tighe sent another claim letter to Combined in August 1997, asking for an additional $31,948 in benefits. In that letter, Tighe deducted 25 percent from his disability benefits for the period of time during which he worked 10 hours a week.

## ASSIGNMENTS OF ERROR

Tighe assigns that the district court erred in (1) finding that the disability policy was unambiguous, (2) finding that Tighe received income from CBS, (3) finding that Tighe received self-employment income through ABM following his disability, (4) finding that the term "self-employment income" means gross earnings from self-employment rather than net earnings, and (5) sustaining Combined's motion for summary judgment.

## STANDARD OF REVIEW

■ Summary judgment is proper only when the pleadings, depositions, admissions, stipulations, and affidavits in the record disclose that there is no genuine issue as to any material fact or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Daniels v. Allstate Indemnity Co., ante* p. 671, 624 N.W.2d 636 (2001); *Kirwan v. Chicago Title Ins. Co., ante* p. 609, 624 N.W.2d 644 (2001).

■ In reviewing a summary judgment, an appellate court views the evidence in a light most favorable to the party against whom the judgment is granted and gives such party the benefit of all reasonable inferences deducible from the evidence. *Daniels v. Allstate Indemnity Co., supra*; *Kirwan v. Chicago Title Ins. Co., supra*.

■ The interpretation of an insurance policy is a question of law, in connection with which an appellate court has an obligation to reach its own conclusions independent of the determination made by the lower court. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

## ANALYSIS

The parties in this case are not disputing the amount of Tighe's insured monthly benefits of $1,500 under the policy. Combined stated at the summary judgment hearing that the sole issue was whether Tighe had received income from an employer or from self-employment following his disability, which under the reduction clause would offset his benefits. Combined's position was that if Tighe had received income, it was entitled to have the disability payments offset by the amount of that income under the reduction clause. Combined contends that the $3,000 to $4,000 a month that Tighe received from CBS following his disability reduced his benefits to zero.

### INCOME FROM EMPLOYER

The district court found that Tighe had received income from his employer, CBS, following his disability, but did not specify the amount of that income. Tighe's federal income tax returns show his wages were $218 in 1994, $319 in 1995, and $445 in

1996. These are the only wages in the record that fairly represent Tighe's income from an employer following his disability.

We note that at oral argument, Combined contended that the $3,000 to $4,000 a month Tighe received from CBS following his disability was income from CBS, as his employer. The evidence in the record on this issue consists of Tighe's income tax returns which show nominal wages and Bahm's testimony that the management consultation fees that CBS paid to Tighe were self-employment income to him through ABM. Bahm also stated that the $3,000 to $4,000 that Tighe received from CBS through ABM was included in gross receipts on the Schedule C for ABM.

In addition, Tighe testified that after his heart attack in July 1994, he was no longer an employee of CBS and that he did not receive a management consultation fee from CBS because he was unable to perform his original duties. Instead, he stated that the money he received from CBS after his heart attack was a draw on his accumulated profits from CBS. No contradicting evidence was submitted by Combined to show that the $3,000 to $4,000 Tighe received from CBS was income from an employer. We conclude that the record does not support Combined's contention.

### SELF-EMPLOYMENT INCOME

Tighe contends that Combined should not have been allowed to reduce his disability benefits because he showed a net loss through ABM for every year except 1994, when ABM had a net profit of $117. He further contends that the district court erred in finding that self-employment income means gross receipts from self-employment. Combined contends that the gross receipts from ABM are Tighe's self-employment income regardless of any business expenses he reported for federal income tax purposes. Therefore, the issue is whether Tighe had self-employment income that reduced the amount of his disability benefits.

In its order, the district court did not explicitly state that it was using gross receipts for Tighe's self-employment income. Net profits, however, would have only marginally reduced Tighe's benefits. Tighe's Schedule C for 1994 showed that ABM's net profits were $117. After 1994, ABM had net losses of $9,676 for 1995, $13,758 for 1996, and $68,715 for 1997. In contrast, ABM's gross receipts were $104,632 for 1994,

$106,670 for 1995, $103,783 for 1996, and $44,583 for 1997. Therefore, the district court could have used only gross receipts to determine that the reduction of Tighe's benefits was correct.

The reduction clause does not specify whether the benefits are to be reduced by gross or net self-employment income. Tighe's position is that the district court erred in failing to find that the term "self-employment income" as used in the reduction clause is ambiguous. He argues that because the phrase is ambiguous, he is entitled to a construction favorable to him. He relies on the Internal Revenue Code, I.R.C. § 1402(b) (1994), which defines self-employment income as net earnings from self-employment.

Combined argues that the terms of the exclusionary clause are clear and should not be construed to create an ambiguity, but should be given their plain and ordinary meaning as an average or reasonable person would understand them. Combined argues an ordinary person would consult the dictionary, not the tax code.

In interpreting a contract, a court must first determine, as a matter of law, whether the contract is ambiguous. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000).

Whether an insurance contract is ambiguous and therefore in need of construction is a question of law. *Moller v. State Farm Mut. Auto. Ins. Co.*, 252 Neb. 722, 566 N.W.2d 382 (1997).

A contract is ambiguous when a word, phrase, or provision in the contract has, or is susceptible of, at least two reasonable but conflicting interpretations or meanings. *Callahan v. Washington Nat. Ins. Co., supra.* But the fact that parties to a document have or suggest opposing interpretations of the document does not necessarily, or by itself, compel the conclusion that the document is ambiguous. *Id.; Moller v. State Farm Mut. Auto. Ins. Co., supra.*

Interpretation of an unambiguous term or provision in an insurance policy presents a question of law. *Callahan v. Washington Nat. Ins. Co., supra; American Family Ins. Group v. Hemenway*, 254 Neb. 134, 575 N.W.2d 143 (1998).

While an ambiguous insurance policy will be construed in favor of the insured, ambiguity will not be read into policy language which is plain and unambiguous in order to construe against the preparer of the contract. *Callahan v. Washington Nat. Ins. Co., supra; American Family Ins. Group v. Hemenway, supra.*

Although Combined correctly argues that "[t]here is no legal requirement that each word used in an insurance policy must be specifically defined in order to be unambiguous," *American Family Ins. Group v. Hemenway*, 254 Neb. at 143, 575 N.W.2d at 149, Combined fails to articulate the plain and obvious meaning of the phrase "income from self-employment." The dictionary defines "income" as revenue or receipts. See Webster's Third New International Dictionary, Unabridged 1143 (1993). However, neither Webster's nor Black's Law Dictionary defines "self-employment income."

In *Hull v. Aetna Ins. Co.*, 249 Neb. 125, 541 N.W.2d 631 (1996), a self-employed claimant for workers' compensation argued that his benefits should be based on his gross income. This court held that "business expenses should be deducted in determining the wage of a self-employed claimant and that business expenses set forth on a claimant's tax return shall be presumed correct." *Id.* at 131, 541 N.W.2d at 635. Net business profits of a sole proprietorship have also been held to be a self-employed claimant's income under a no-fault automobile provision for disability benefits. See *Zyck v. Hartford Insurance Group*, 143 N.J. Super. 580, 364 A.2d 32 (1976). The Mississippi Supreme Court has specifically held that net profits must be used for determining the amount of a self-employed insured's benefits under a disability insurance policy. See *Prudence Life Ins. Co. v. Prisock*, 254 Miss. 316, 180 So. 2d 636 (1965). See, also, 12 Lee R. Russ & Thomas F. Segalla, Couch on Insurance 3d § 182:18 at 182-24 (1998) ("[g]enerally, the [self-employed] insured's income should be calculated for benefit purposes in the same manner that it is for tax purposes").

Although we recognize that the courts in the cited cases were dealing with the amount of an insured's benefits, the same reasoning applies to self-employment income as used in Combined's reduction clause. The reduction clause was designed to allow Combined to reduce an insured's benefits by income he or she receives from an employer or self-employment. In the case of a self-employed insured, however, it is the net profits of a business that are the true representation of the value of the insured's services to himself or herself. See *Zyck v. Hartford Insurance Group, supra.*

To interpret income from self-employment as gross receipts in a reduction of benefits clause would allow an insurer to reduce its liability by gross revenues which do not represent actual income to the insured. Therefore, it would be unreasonable to interpret self-employment income to mean gross receipts. A contract is not ambiguous unless a word, phrase, or provision has, or is susceptible of, at least two *reasonable* but conflicting interpretations or meanings. *Callahan v. Washington Nat. Ins. Co.*, 259 Neb. 145, 608 N.W.2d 592 (2000). Because it would be unreasonable to interpret self-employment income under Combined's reduction clause to mean gross receipts, the contract is not ambiguous. We conclude that self-employment income, as used in Combined's reduction clause, is net of business expenses.

This interpretation is supported by the fact that net business profits are reported as self-employment income under the Internal Revenue Code. Although Combined argues that self-employment income under the tax code is a complicated determination, the basic premise that business expenses should be deducted from gross receipts is not difficult. See I.R.C. § 1402(b) ("term 'self-employment income' means the net earnings from self-employment derived by an individual").

## CONCLUSION

We conclude that the district court erred in granting Combined's motion for summary judgment because the district court should have used net earnings for Tighe's self-employment income, and using net earnings, Combined has not proved its reduction of benefits was proper or that it was entitled to judgment as a matter of law. Tighe's attorney is allowed $2,700 in attorney fees for services in this court. Therefore, we reverse.

REVERSED.